<table>
<tr><td>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

</td><td>

Eastern District of Kentucky
**F I L E D**

JUL 3 0 2019

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

</td></tr>
</table>

**UNITED STATES OF AMERICA**

V.          **SUPERSEDING INDICTMENT NO. 5:18-CR-111-S-JMH**

**CHRISTOPHER G. HICKERSON**

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

**STATUTORY BACKGROUND**

1.  In 1938, Congress passed the Federal Crop Insurance Act ("Act"), 7 U.S.C. § 1501 *et seq.*, in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

2.  In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation ("FCIC"), which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the United States Department of Agriculture (USDA). 7 U.S.C. §§ 1503 and 1508. Tobacco, wheat, corn, and soybeans were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

3.  The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with a bona fide insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A

crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such naturally occurring events caused the harvest for the farm to be less than the amount specified in the insurance contract or written policy agreement, also known as the "guarantee." These federally-backed crop insurance policies are referred to as multi-peril crop insurance ("MPCI") policies.

4. Farmers who opt to insure their crop are required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his or her yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his or her crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under the policy.

5. Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold and the cause of loss.

6. The insurance coverage, also called the guarantee, and premiums of coverage are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN"). This means that the farmer's actual production history ("APH") determines the insurance policy's guarantee, based on how much of that crop the farmer has produced on that FSN during each of the four years immediately preceding the year for which insurance is sought. 7 U.S.C. § 1508. If a farmer has produced that crop for more than

four years, the guarantee will be based upon that farmer's production history of those preceding years, but no more than ten years of production history will be used. 7 U.S.C. § 1508. A new producer is a person who has not actively engaged in farming of the crop sought to be insured in the county for more than two years. 7 C.F.R. § 400.52. New producers are given an estimated production yield based upon the county average production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and 400.55(b)(6). New producers can get a higher guarantee than a farmer with consistently reported losses.

7. Through the federal program, a farmer can elect to insure tobacco crop up to 75% of the APH guarantee. If a farmer elects 75% coverage on his tobacco crop, that farmer needs to sustain crop damage in excess of 25% to trigger a claim payment. A farmer can elect to insure corn and soybean crops up to 85% of the APH guarantee and may elect revenue protection.

8. The Risk Management Agency ("RMA") is an agency of the USDA that supervises the FCIC and administers all programs authorized under the Act. 7 U.S.C. § 6933. Most crop insurance is sold by approved private insurance companies, called Approved Insurance Providers ("AIPs"), through an insurance agent working on behalf of the AIP. AIPs are reinsured by the FCIC/RMA under provisions established in a Standard Reinsurance Agreement ("SRA"), a contract between the AIPs and RMA. The FCIC/RMA also pays, or subsidizes, a portion of the premium paid by the farmer.

9. The insurance agent obtains basic information from the producer pertaining to the crop to be insured. This information is reported on forms the producer sends to his

or her agent. The producer and agent acknowledge on these forms that failure to report completely and accurately may void the applicant's crop insurance policy and may result in criminal or civil false claims actions. The crop insurance agent forwards this information through the insurance company to FCIC/RMA. This information, including the Production Worksheet, is used to calculate the premium to be paid by the producer for the insurance, and is also used to calculate the indemnity in the event of a loss claim.

10. Producers often elect to take their crop to harvest even after the crop has sustained damage. A Production Worksheet is used to record the amount of harvested production to include crop sales, quality assessments, and harvest appraisals, among other things, to ascertain the production to count, or actual yield, used in determining the indemnity due. The producer certifies on this report that failure to report completely and accurately may result in the voiding of the applicant's crop insurance contract and may result in criminal or civil false claims actions.

11. The FCIC tobacco crop provisions provide for quality loss adjustment should the burley tobacco crop sustain damage reducing the quality of the crop. RMA's procedures for burley tobacco rely on grades assigned by Agriculture Marketing Service ("AMS") graders using USDA Official Standard Grades. The lowest grade quality is a No Grade ("NOG"). A loss that reduces the quality, or grade, of the tobacco can result in an increased indemnity.

12. According to RMA established procedures, if the producer believes he or she has a potential loss of quality, he or she must determine which bales of tobacco need to be graded. The Tobacco Administration Grading Service ("TAGS") was established to

facilitate the grading process and provide scheduling services via telephone or a website. A producer with a potential loss of quality can schedule an inspection with the AMS grader by contacting TAGS. The producer may ask his or her crop insurance agent for assistance in scheduling an inspection. The producer is charged a fee for the grading process. The producer receives a unique Grading Confirmation Number ("GCN") intended to track the bales graded. AMS electronically transmits the GCN information to RMA. Tobacco bales designated as NOG receive the highest discount factor resulting in a higher amount of loss, and thus, higher indemnities. The grade, weights, and other relevant information is transmitted to the appropriate insurance company to complete the claim.

13. When a loss is paid on a crop insurance policy, the loss is calculated by the AIP and paid to the producer, often through the agent. Pursuant to the SRA, the AIP is reimbursed by the FCIC/RMA.

14. Insured producers are required to retain documentation related to their crop from planting through the disposition of their crop, including receipts for seed and other expenditures. They may be required to turn this documentation over to their agent or AIP to justify claims of loss or other inquiries.

## FACTUAL BACKGROUND

15. At all times relevant hereto, **CHRISTOPHER G. HICKERSON** owned and rented farmland in Fleming County, in the Eastern District of Kentucky. He produced tobacco, winter wheat, and soybeans, among other crops. From at least 1997, **HICKERSON** had crop insurance covering his tobacco crop. Beginning in 2008,

**HICKERSON** began insuring his soybeans and wheat, among other crops.

16. Since 2006, **HICKERSON** secured federal crop insurance with Rural Community Insurance Services ("RCIS") from D.M., his insurance agent. He also obtained federal crop insurance policies with ARMtech Insurance Services ("ARMtech") and NAU Country Insurance Company ("NAU").

17. A.H. and D.H. are relatives of **HICKERSON**.

## COUNT 1
## 18 U.S.C. § 371

18. Paragraphs 1 through 17 above are re-alleged and incorporated herein by reference.

19. From in or about January 2015, and continuing through in or about April 2015, in Fleming County, in the Eastern District of Kentucky and elsewhere,

### CHRISTOPHER G. HICKERSON

and others knowingly and willfully conspired and agreed to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

### Purpose of the Conspiracy

20. It was the purpose of the conspiracy to profit through the filing of false and fictitious crop insurance claims by obtaining false quality adjustments.

## Manner and Means

21. With the assistance of R.W. and D.M., **HICKERSON** presented low-quality tobacco that did not belong to him to USDA graders, in order to obtain a larger quality adjustment on the low-quality tobacco, which resulted in a higher indemnity payment. R.W. and D.M. provided **HICKERSON** with false sales bills indicating that HICKERSON sold the tobacco to Clay's Tobacco Warehouse.

## Overt Acts

22. Between on or about January 21, 2015, and March 4, 2015, USDA graders graded tobacco in the name of **HICKERSON**, giving the tobacco he presented as his own N-grades or other low-quality grades.

23. On or about January 21, 2015, January 28, 2015, February 4, 2015, February 11, 2015, and again on or around March 4, 2015, Clay's Tobacco Warehouse employees provided **HICKERSON** Tobacco Sale Bills indicating he sold tobacco to numerous buyers, all for less than $1.00 per pound.

24. On or about March 13, 2015, March 26, 2015, March 28, 2015, and April 28, 2015, **HICKERSON** signed Production Worksheets and a Production Report certifying the amount of tobacco he produced, a substantial amount of which was falsely quality-adjusted.

25. On or about April 3, 2015, **HICKERSON** received three insurance indemnity checks from RCIS totaling $124,891. **HICKERSON** applied a portion of these proceeds to outstanding loans at Peoples Bank and deposited the remainder into his personal bank account at Peoples Bank.

All in violation of Title 18, United States Code Section 371.

## COUNT 2
## 18 U.S.C. § 371

26. Paragraphs 1 through 17 above are re-alleged and incorporated herein by reference.

27. From in or about March 2014, and continuing through in or about the date of this Indictment, in Fleming County, in the Eastern District of Kentucky and elsewhere,

### CHRISTOPHER G. HICKERSON

and others knowingly and willfully conspired and agreed to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

### Purpose of the Conspiracy

28. It was the purpose of the conspiracy to profit through the filing of false and fictitious crop insurance claims by obtaining crop insurance policies in nominee names.

### Manner and Means

29. **HICKERSON** agreed with A.H. and D.H. to obtain crop insurance policies in the names of A.H. and D.H., which enabled them to get new producer status.

### Overt Acts

30. On or about March 14, 2015, A.H. signed application documents applying for MPCI coverage over three crops in Fleming County, certifying that A.H. had a 100%

insurable interest in the crop. On July 14, 2015, A.H. signed an acreage report stating again that she had a 100% insurable interest in a tobacco crop, when she knew that to be false.

31. On or about March 14, 2015, **HICKERSON** or D.H. signed application documents applying for MPCI coverage over three crops in Fleming County, certifying the D.H. had a 100% insurable interest in the crop. On July 14, 2015, D.H. signed an acreage report stating again that he had a 100% insurable interest in a tobacco crop, when he knew that to be false.

32. On or about September 18, 2015, ARMtech crop insurance checks representing indemnity payments from crop year 2015 paid to A.H. and D.H., respectively, were deposited into **HICKERSON's** bank account at Peoples Bank.

33. On or about January 13, 2017, **HICKERSON** or A.H. signed a Production Worksheet certifiying that A.H. produced 1,718 pounds of harvested tobacco on Farm Number 3194, under her MPCI policy with ARMtech.

All in violation of Title 18, United States Code Section 371.

## COUNTS 3-10
## 18 U.S.C. § 1014

34. Paragraphs 1 through 33 above are re-alleged and incorporated herein by reference.

35. On or about the dates listed below, in Fleming County, in the Eastern District of Kentucky,

## CHRISTOPHER G. HICKERSON

knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Dates | False Statements |
|---|---|---|
| 3 | December 14, 2009, and January 29, 2010 | **HICKERSON** reported to his AIP on his Production Worksheets that he produced 89,640 pounds of harvested tobacco for crop year 2009, when he knew he produced additional pounds of tobacco he failed to report. |
| 4 | February 21, 2011 | **HICKERSON** reported to his AIP on his Production Worksheet that he produced 74,675 pounds of harvested tobacco for crop year 2010, when he knew he produced additional pounds of tobacco he failed to report. |
| 5 | February 28, 2012 | **HICKERSON** reported to his AIP on his Production Worksheet that he produced 54,260 pounds of harvested tobacco for crop year 2011, when he knew he produced additional pounds of tobacco he failed to report. |
| 6 | October 6, 2012, January 17, 2013, and February 19, 2013 | **HICKERSON** reported to his AIP on his Production Worksheets and Production Report that he produced 43,818 pounds of harvested tobacco for crop year 2012, when he knew he produced additional pounds of tobacco he failed to report. |
| 7 | April 12, 2014 | **HICKERSON** reported to his AIP on his Production Report that he incurred a loss on four farms in crop year 2013. HICKERSON knew he produced more tobacco on those farms than he reported, but shifted the production to any of five other farms on which he reported no loss or damage. |
| 8 | March 13, 2015, March 26, 2015, and March 28, 2015 | **HICKERSON** reported to his AIP on his Production Worksheets that he produced 124,247 pounds of harvested tobacco for crop year 2014, when he knew he produced additional pounds of tobacco he failed to report. |

| 9 | February 1, 2016 | **HICKERSON** reported to his AIP on his Production Worksheets that he produced 31,582 pounds of harvested tobacco for crop year 2015, when he knew he produced additional pounds of tobacco he failed to report. |
|---|---|---|
| 10 | October 3, 2016, January 21, 2017, and January 26, 2017 | **HICKERSON** reported to his AIP on his Production Worksheets that he produced 37,991 pounds of harvested tobacco for crop year 2016, when he knew he produced additional pounds of tobacco he failed to report. |

All in violation of Title 18, United States Code, Section 1014.

## COUNT 11
### 26 U.S.C. § 7206(2)

On or about October 14, 2014, in the Eastern District of Kentucky,

### CHRISTOPHER G. HICKERSON,

a resident of Flemingsburg, Kentucky, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service of a U.S. Individual Income Tax Return, Form 1040, of **CHRISTOPHER G. HICKERSON** for the calendar year 2013. The return was false and fraudulent as to a material matter, in that it stated that he received $422,210 in income, whereas he then and there knew his income was greater, all in violation of 26 U.S.C. § 7206(2).

## COUNT 12
### 26 U.S.C. § 7206(2)

On or about September 14, 2016, in the Eastern District of Kentucky,

### CHRISTOPHER G. HICKERSON,

a resident of Flemingsburg, Kentucky, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service of a U.S.

Individual Income Tax Return, Form 1040, of **CHRISTOPHER G. HICKERSON** for the calendar year 2015. The return was false and fraudulent as to a material matter, in that it stated that he received $573,887 in income, whereas he then and there knew that his income was greater, all in violation of 26 U.S.C. § 7206(2).

## FORFEITURE ALLEGATION
### 18 U.S.C. § 982

In committing the felony offenses alleged in Counts 1 through 10 of this Indictment, each punishable by imprisonment for more than one year, **CHRISTOPHER G. HICKERSON** shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of violations of 18 U.S.C. § 1014.

The property to be forfeited includes, but is not limited to, the following:

MONEY JUDGMENT in the approximate amount of proceeds derived from crop insurance fraud.

**SUBSTITUTE ASSETS:**

If any of the property listed above, as a result of any act or omission of the defendant,

    (1) cannot be located upon the exercise of due diligence
    (2) has been transferred or sold to, or deposited with, a third party;
    (3) has been placed beyond the jurisdiction of the Court;
    (4) has been substantially diminished in value; or
    (5) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek the forfeiture of any other property in which the above defendant has an interest, up to the value of the judgment described above and pursuant to 21 U.S.C. § 853(p), as incorporated in 18 U.S.C. § 982(b)(1).

**A TRUE BILL**

*/s/ Robert M. Duncan, Jr.*

**ROBERT M. DUNCAN, JR.**
**UNITED STATES ATTORNEY**

## PENALTIES

**COUNTS 1-2:** Not more than 5 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**COUNTS 3-10:** Not more than than 30 years imprisonment, $1,000,000 fine or twice the gross gain or loss, and 5 years supervised release.

**COUNTS 11-12:** Not more than 3 years imprisonment, $100,000 fine or twice the gross gain or loss, and supervised release of not more than 1 year.

**PLUS:** Mandatory special assessment of $100 per count.

**PLUS:** Restitution, if applicable.